DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

CHRIS KALTSAS (NYBN 5460902)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
    Email:  chris.kaltsas2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>APPROXIMATELY $18,100 IN U.S. CURRENCY,<br><br>    and<br><br>APPROXIMATELY $72,960 IN U.S. CURRENCY,<br><br>    Defendants. | CASE NO.<br><br>**VERIFIED COMPLAINT FOR CIVIL FORFEITURE *IN REM*** |

    The United States of America, by its attorneys, David L. Anderson, United States Attorney, and Chris Kaltsas, Assistant United States Attorney for the Northern District of California, brings this complaint and alleges as follows:

COMPLAINT FOR CIVIL FORFEITURE            2

## NATURE OF THE ACTION

1. This is a judicial forfeiture action *in rem*, as authorized by Title 18, United States Code, Section 981; and Title 21, United States Code, Section 881(a).

2. This Court has jurisdiction under Title 18, United States Code, Section 981; Title 21, United States Code, Section 881(a)(6); and Title 28, United States Code, Sections 1345 and 1355, as the defendant property constitutes or is derived from proceeds obtained, directly or indirectly, from a violation of Title 21, United States Code, Section(s) 841 and/or 846.

3. This action is timely filed in accordance with Title 18, United States Code, Section 983(a)(3)(A).

4. Venue is proper because the defendant currency was seized in the Northern District of California and is currently located in this district. See Title 28, United States Code, Sections 1355(b) and 1395(a)-(c).

5. Intra-district venue is proper in the San Francisco division within the Northern District of California.

## PARTIES

6. Plaintiff is the United States of America.

7. The defendant properties include:

- Approximately $18,100 in U.S. currency (Asset ID 19-DEA-655271); and
- Approximately $72,690 in U.S. currency (Asset ID 19-DEA-655272).[1]

## FACTS

8. On August 22, 2019, the Drug Enforcement Administration ("DEA") Task Force based at the San Francisco International Airport ("SFO") received information from a Transportation Security Administration ("TSA") unit located in Atlanta, Georgia. The TSA told DEA agents that Kimiko Masae

---

[1] As explained below, the DEA obtained $18,100 from one bag, and $72,690 from a second bag during the same incident, which is why the two amounts of currency are distinguished in the case caption.

COMPLAINT FOR CIVIL FORFEITURE 3

Ferguson ("FERGUSON"), who resides in Oakland, California, had boarded Delta Airlines flight #2049 at the Hartfield-Jackson Atlanta International Airport and was en route to SFO. The TSA further told the DEA agents that, during a checkpoint screening, they discovered FERGUSON was in possession of a large amount of U.S. Currency in her carryon luggage. The TSA told the DEA that they had permitted FERGUSON to board her flight to SFO without incident.

9. Upon receiving this information, the DEA office at SFO relayed the TSA's report to DEA Task Force Officer Andrew Harper. A computer records check for FERGUSON was conducted. The records returned FERGUSON's photograph, a description of her basic physical characteristics, and a criminal history. FERGUSON's criminal history indicated that she had several past encounters with law enforcement, including multiple arrests for domestic violence and driving under the influence. Officer Harper and DEA Special Agent George Krieg established surveillance of Gate 43 at SFO, where Delta Airlines flight #2049 was due to arrive. Officer Harper and Special Agent Krieg intended to ask FERGUSON to consent to a voluntary interview after she deplaned from her flight.

10. Delta Airlines flight #2049 arrived at SFO Gate 43 at 10:12 a.m. Officer Harper and Special Agent Krieg were able to identify FERGUSON as she deplaned using the photograph Officer Harper had obtained via the records check. Officer Harper and Special Agent Krieg observed FERGUSON leave the airplane with two bags, namely, one leather duffel bag, and one small, white linen handbag. Officer Harper and Special Agent Krieg observed FERGUSON walking straight from the airplane into a nearby restroom at approximately 10:17 a.m.

11. FERGUSON was in the restroom for nearly ten minutes before she exited. At that time, Officer Harper and Special Agent Krieg observed FERGUSON speaking on her cellphone while carrying her luggage. Officer Harper and DEA Task Force Officer Victor Bertolozzi, who was accompanying Officer Harper at that time, noticed that FERGUSON was walking rapidly towards the baggage claim area. As she did so, FERGUSON appeared to glance around quickly and acted nervously while speaking

COMPLAINT FOR CIVIL FORFEITURE 4

into her cellphone. When she reached the baggage claim area, FERGUSON walked directly past the baggage carousel where her checked-in luggage was due to arrive and exited from exit door sixteen.

12. As soon as FERGUSON exited the baggage claim area, Officer Harper called out her name. FERGUSON turned around, and identified herself to Officers Harper and Bertolozzi. While identifying herself, however, FERGUSON refused to end her telephone call. When the officers attempted to explain why they wanted to speak with FERGUSON, FERGUSON kept speaking into the phone and appeared to ignore what the officers said. Officer Harper specifically told FERGUSON that he believed FERGUSON was carrying the proceeds of narcotics sales, and that her nervous body language and abnormal behavior were consistent with someone engaged in narcotics trafficking in an airport. DEA Task Force Officer Duane Fisher, who was also present at the scene, also attempted to engage with FERGUSON.

13. As Officer Fisher attempted to speak with FERGUSON and reached for the leather duffel bag she was carrying, a man (later identified as Mohammad Sharifi ("SHARIFI")) began yelling from his vehicle in the pickup/drop off lanes near the pedestrian island at the exit of the baggage claim area. SHARIFI then parked his car and walked through traffic while continuing to scream at the officers. When the officers noticed SHARIFI coming towards them, Officer Fisher shouted, "Federal agents, back up!" SHARIFI shouted an expletive at the officers and kept approaching. At that point, Officers Harper and Bertolozzi both yelled "Federal agents! Stop! Step back!" while Officer Harper pulled out credentials identifying himself as a law enforcement officer. Officer Bertolozzi already had his San Mateo County Deputy Sheriff star displayed on his chest.

14. SHARIFI continued to walk briskly towards the officers while screaming at them. When SHARIFI closed in on the officers, he balled his hands into fists and raised them in front of his body while assuming what appeared to be a boxing stance. The officers approached SHARIFI with the intent of preventing him from assaulting anyone, but as the officers approached, SHARIFI threw a punch that nearly hit Officer Harper's face.

COMPLAINT FOR CIVIL FORFEITURE 5

15. After trying to punch Officer Harper, SHARIFI ran towards FERGUSON, grabbed her, and started shaking her from side to side. FERGUSON either dropped the white linen handbag that she had been holding as SHARIFI attacked her, or had already dropped the white linen handbag to the ground. Regardless, at that moment, Officer Fisher noticed the open bag, which revealed a substantial amount of U.S. currency inside.

16. Officer Bertolozzi attempted to pull SHARIFI off of FERGUSON as SHARIFI attacked her. SHARIFI responded by attempting to punch Officer Bertolozzi. Officer Harper then engaged with SHARIFI and pushed him to prevent him from hitting Officer Bertolozzi. As SHARIFI went off balance, Officer Bertolozzi quickly responded and attempted to grab SHARIFI's hands. SHARIFI, however, threw several more punches at Officer Bertolozzi, none of which connected. As SHARIFI continued to throw punches at the officers, Officer Harper struck SHARIFI on the chest with an open hand to knock him off balance to ensure the officers' safety.

17. Once SHARIFI was knocked off balance again, he started screaming, "I'm going to get my strap!" repeatedly. Based on my training and experience, I know that "strap" is a slang term commonly used by those in the illicit narcotics trade to refer to a firearm. As he screamed, SHARIFI appeared to reach down toward his leg, indicating to the officers that he might have a weapon on his person. He then ran to his car, continuing to scream that he would get his "strap." The officers believed that SHARIFI posed a credible threat based on his erratic behavior and the fighting that had just occurred. The officers thus drew their weapons and ordered SHARIFI to stop. SHARIFI continued running to his vehicle and sped away. The officers' encounter with SHARIFI lasted less than 45 seconds.

18. Later investigation revealed that SHARIFI had recently finished serving a sentence on a California state conviction for carjacking. During his time in prison, SHARIFI distributed narcotics to other inmates. A short time after he was released, SHARIFI had been arrested yet again for, among other

things, possession of a controlled substance while armed; possession of a firearm by a convicted felon; and possession of ammunition by a convicted felon.

19. Once SHARIFI left the scene, the officers informed FERGUSON that they were detaining her for her own safety as SHARIFI could return at any moment with a firearm. The officers explained to FERUGSON that she was not under arrest and that they were bringing FERGUSON to safety. FERGUSON indicated that she understood. Officer Fisher placed handcuffs on FERGUSON and led her towards the baggage claim area. As she walked with the officers, she acknowledged that SHARIFI had acted "crazy." The officers noted that FERGUSON appeared anxious regarding the incident with SHARIFI. At that time, Officer Harper asked FERGUSON whether they could talk, and whether she would prefer to do so in the baggage area or in the adjacent open front lobby of an SFO police substation. FERGUSON indicated that she would rather talk in the substation as it was more private than the baggage claim area, where numerous passengers observed the incident with SHARIFI.

20. As FERGUSON sat down with the officers at the substation, the officers placed FERGUSON's duffel bag and handbag next to her. FERGUSON apologized for SHARIFI's actions, and explained that SHARIFI's actions scared her. Officer Harper spoke with SFO police about the events that had just occurred before removing handcuffs from FERGUSON's wrists, at which point Officer Harper reminded FERGUSON that she was not under arrest. Officer Harper did, however, advise FERGUSON that another law enforcement officer wished to speak with her about the money she was carrying, as well as the incident with SHARIFI. Thereafter, DEA Task Force Officer Blake Molyneux entered the substation carrying the luggage that FERGUSON had checked in Atlanta.

21. Upon the officers' request, FERGUSON consented to a search of her luggage, including the checked bag Officer Molyneux had retrieved from baggage claim. Officer Harper asked FERGUSON whether her baggage contained any narcotics or large sums of currency. FERGUSON indicated that she did not have narcotics with her, but that she was carrying large sums of currency in the duffel bag and

handbag. A search of the handbag revealed $18,100 in U.S. Currency, whereas a search of the duffel bag revealed $72,690 in U.S. Currency. The cash in the handbag was wrapped in rubber bands. The cash in the duffel bag was concealed in three separate pairs of jeans. The majority of the cash appeared to be $20 bills, although the stacks of cash contained $100, $50, $10, and $5 bills as well.

22. When asked about the owner of the money, FERGUSON indicated that the money in the duffel bag belonged to the man involved in the incident outside, who the officers later determined was SHARIFI. FERGUSON did not identify SHARIFI at that juncture, however, because she stated she was afraid of him and what would happen to her if she identified SHARIFI to police.

23. The officers asked FERGUSON whether she had been paid to carry the currency to San Francisco from Atlanta; whether the currency constituted the proceeds of narcotics sales; and whether the currency was to be used for the purchase of narcotics. FERGUSON denied that the money was related to narcotics or that she had been paid to courier the currency. When asked, however, FERGUSON refused to state why she had the money, what her relationship to SHARIFI was, and was unable to give the officers an estimate as to the amount of money in the handbag despite claiming that the money in the handbag was hers.

24. The officers then asked FERGUSON about her line of employment, to which she replied that she was unemployed, but clarified, without prompting from the officers, that she was "not a prostitute." Officers then asked for clarification, at which point FERGUSON stated that she occasionally worked as an exotic dancer. FERGUSON then said that she worked in various "gentlemen's" clubs in the San Francisco area, among other places, and when the officers asked how much she made on average per night, FERGUSON stated that it was possible to make over $30,000 in one weekend in Atlanta.

25. Officer Harper told FERGUSON that he found it suspicious that FERGUSON did not know how much money she was carrying if the money was actually hers. FERGUSON replied that she knew

COMPLAINT FOR CIVIL FORFEITURE         8

"it looked hella shady." FERGUSON further stated that she did not deposit the money in a bank because she did not have time to do so before she left Atlanta.

26. At that point, Officer Harper smelled the cash and realized that the odor of marijuana was emanating from the money. DEA Task Force Officer Ariana Daggett, who had also smelled the money, relayed this fact to FERGUSON. FERGUSON's eyes then widened as she pursed her lips and looked away from the officers.

27. FERGUSON then told Officer Harper that she could produce bank receipts for the money in the handbag. When Officer Harper asked FERGUSON how much she could account for, FERGUSON stated "8 to 25." FERGUSON clarified that she meant she could account for between $800 and $2,500. Officer Harper noted that the bag held far more than $2,500, to which FERGUSON had no response.

28. Officer Harper explained that the DEA would detain the money he and the other officers found in FERGUSON's luggage pending further investigation, as he suspected that FERGUSON brought the money to California as either proceeds of narcotics transactions, or for the purpose of purchasing narcotics. FERGUSON did not protest the seizure of the money in the duffel bag, but insisted that she earned the money in the white linen bag while working as an exotic dancer.

29. At that time, Officer Harper placed the currency from FERGUSON's handbag into a self-sealing evidence envelope marked as N-1a, and placed the money found in the brown duffel bag into a self-sealing evidence envelope marked as N-3a. Officer Bertolozzi and FERGUSON witnessed Officer Harper placing the cash into the evidence envelopes. FERGUSON signed the two evidence bags as the putative owner of the funds located therein. FERGUSON also received a DEA-12 form, which was her receipt for the seized currency. Officer Harper retained control of the evidence envelopes until Task Force Officers Robert Kett and Daggett were able to transport the money to a Bank of America branch in San Mateo, California. At the bank, Officers Kett and Daggett witnessed the counting of the money. The money in evidence envelope N-1a consisted of 17 $100 bills; 20 $50 bills; 748 $20 bills; 41 $10 bills; and

6 $5 bills, totaling $18,100. The money in evidence envelope N-3a consisted of 127 $100 bills; 96 $50 bills; 2,658 $20 bills; 125 $10 bills; and 156 $5 bills, totaling $72,690. Together, the two bags contained $90,790 in cash. The cash from both envelopes was converted into two cashier's checks made payable to the U.S. Marshal's service. The amounts of the checks reflected the sum of currency in each of the respective evidence envelopes.

30. Earlier that morning, Officer Molyneux had his certified drug detection canine, "Mannix," clear an area near baggage carousel #1 in the baggage claim area at SFO. At that time, Mannix did not alert to the odor of narcotics in the area. At approximately 11:24 a.m., Officer Molyneux placed the evidence bags containing the currency seized from FERGUSON in the area near baggage carousel #1. Officer Molyneux had Mannix conduct an off-leash systematic search of the area. Mannix alerted to both bags containing the seized currency, indicating that the odor of narcotics was emanating from the currency.

31. FERGUSON, through counsel, filed a timely claim to the seized cash on October 28, 2019. FERGUSON, through counsel, filed an amended claim on November 12, 2019.

## CLAIM FOR RELIEF

32. The United States incorporates by reference the allegations in paragraphs 1 through 31 as though fully set forth herein.

33. Title 21, United States Code, Section 841(a) prohibits the manufacture, distribution, dispensing, and possession with the intent to distribute a controlled substance.

34. Title 21, United States Code, Section 846 prohibits a person from attempting, conspiring, or agreeing to distribute or to possess with the intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a).

35. Title 21, United States Code, Section 881(a)(6) provides, in relevant part, for the forfeiture of all moneys, securities, or other things of value furnished or intended to be furnished to or by any person in exchange for a controlled substance or listed chemical, in violation of Title 21, United States Code,

Chapter 13, Subchapter 1; all proceeds traceable to such an exchange; and all money used or intended to be used to facilitate any violation of Title 21, United States Code, Chapter 13, Subchapter I.

36. In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the Defendant Property represents proceeds traceable to money, securities, or other things of value furnished to or by a person in exchange for a controlled substance, or intended to do so, in violation of Title 21, United States Code, Section 841(a) and 846. The Defendant Property listed herein is thus subject to forfeiture under Title 21, United States Code, Section 881(a)(6).

*****

WHEREFORE, plaintiff United States of America requests that due process issue to enforce the forfeiture of the above listed Defendant Property; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that judgment of forfeiture be entered; that the Court enter a judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as may be proper and just.

DATED: January 30, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

CHRIS KALTSAS
Assistant United States Attorney

COMPLAINT FOR CIVIL FORFEITURE       11

## VERIFICATION

I, Andrew Harper, state as follows:

1. I am a Task Force Officer with the U.S. Drug Enforcement Administration. I am an agent assigned to this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2. I have read the Complaint and believe the allegations contained therein to be true.

\* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of January, 2019, in San Francisco, California.

Andrew Harper
Task Force Officer
Drug Enforcement Administration

COMPLAINT FOR CIVIL FORFEITURE    12

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
United States of America

**DEFENDANTS**
Approximately $18,100 in US Currency and Approximately $72,960 in US Currency

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Chris Kaltsas
450 Golden Gate Avenue, 9th Floor
San Francisco, CA 94102  415-436-6915

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [X] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [X] 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | | 862 Black Lung (923) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 864 SSID Title XVI | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [X] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation–Transfer
- [ ] 8  Multidistrict Litigation–Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 21, United States Code, Section 881(a)(6)
Brief description of cause:
Drug Related Forfeiture

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  [X] No

**VIII. RELATED CASE(S), IF ANY** *(See instructions)*:
JUDGE
DOCKET NUMBER

**IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)**
*(Place an "X" in One Box Only)*
[X] SAN FRANCISCO/OAKLAND   ☐ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE 01/30/2020   SIGNATURE OF ATTORNEY OF RECORD